**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JERRY WEGLARZ and | ) |
| NATHAN WEGLARZ, | ) |
| on behalf of plaintiffs and a class, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| JP MORGAN CHASE BANK, N.A. and | ) |
| NATIONAL COLLEGIATE TRUST, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT – CLASS ACTION

### INTRODUCTION

1.      Plaintiffs bring this class action to secure redress for student loan borrowers whose interest rates were tied to the London Interbank Offered Rate ("LIBOR"). Plaintiffs and numerous other borrowers contracted for interest rates tied to LIBOR, which was supposed to be an objectively determined, impartial index representing the cost of unsecured borrowing in the London interbank market.  In fact, as a result of Government investigations, it is now apparent that defendant JP Morgan Chase Bank, N.A., manipulated LIBOR, and that it was not a valid index.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S.C. §1332(d).

3.      The amount in controversy, on a classwide basis, exceeds $5 million, exclusive of interest and costs.

4.      Plaintiffs and defendants are of diverse citizenship.

5.      Venue in this district is proper because a material part of the conduct complained of occurred in this District and because defendants do business in this District.

### PARTIES

6.      Plaintiff Jerry Weglarz is a resident of the Northern District of Illinois.

7.     Plaintiff Nathan Weglarz is a resident of the Northern District of Illinois.

8.     Defendant JP Morgan Chase Bank, N.A., is a federally chartered national banking association headquartered in New York, New York.  It is a major student loan lender.  It may be served at 100 East Broad Street, Columbus, OH 43125.

9.     Defendant National Collegiate Trust is a Delaware business trust that holds the loans at issue herein.  It has offices at 466 Lexington Ave., New York, NY 10017-3140.

## FACTS

## LIBOR

10.     The London Interbank Offered Rate ("LIBOR") purports to be an objective interest rate.  It is purported to be the average interest rate at which leading banks borrow funds of a sizeable amount from other banks in the London market.

11.     LIBOR is supposedly calculated on an objective basis each day by Thomson Reuters, acting on behalf of the British Bankers Association ("BBA"), and released at 11 a.m. London time each business day.  The Wall Street Journal and other US sources report the rate the next business day.

12.     Major banks were supposed to submit their cost of borrowing unsecured funds for 15 periods of time in 10 currencies. A trimmed average of the collected figures was then supposed to be taken to create LIBOR.

13.     LIBOR is widely used as an index for various financial obligations, including student loans.

14.     The BBA represented LIBOR to be objective and fair:  "The calculation is therefore fully transparent".  (http://www.bbalibor.com/bbalibor-explained/faqs)

## MANIPULATION OF LIBOR

15.     Beginning no later than 2007, defendant JP Morgan Chase Bank, N.A. and other banks, either individually or in concert, manipulated LIBOR.  The banks involved in

2

manipulation included:

      a.      Barclays;

      b.      Royal Bank of Scotland, which does business in the United States as Citizens and Charter One;

      c.      Bank of America;

      d.      Merrill Lynch;

      e.      Citibank;

      f.      Deutsche Bank;

      g.      HSBC;

      h.      JP Morgan Chase/ Chase/ Bank One.

16.      Of the banks listed above, Barclays has admitted that it is guilty of manipulating the LIBOR rate, entering into a consent order with the Commodities Futures Trading Commission ("CFTC"), a copy of which is attached as Appendix A.  Barclays agreed to pay the CFTC and its UK counterpart about $450 million.

17.      Investigations and/or legal actions are continuing against the banks named above in the United States, Switzerland, Japan, United Kingdom, Canada, the European Union, and Singapore by nine different governmental agencies, including the United States Department of Justice ("DOJ"), the Securities & Exchange Commission ("SEC") and the CFTC.

18.      On February 27, 2012, the DOJ stated that it "is conducting a criminal investigation into alleged manipulation of certain benchmark interest rates, including LIBORs of several currencies." The investigation represents an unprecedented joint investigation by both the criminal and antitrust divisions of the DOJ.

19.      The first public revelation regarding government investigations into possible LIBOR manipulation occurred on March 15, 2011, when UBS disclosed in a Form 20-F (annual report) filed with the SEC that the bank had "received subpoenas" from the SEC, the CFTC, and the DOJ "in connection with investigations regarding submissions to the [BBA]."

UBS stated that it understood "that the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times." The bank further disclosed that it had "received an order to provide information to the Japan Financial Supervisory Agency concerning similar matters." UBS stated it was "conducting an internal review" and was "cooperating with the investigations."

20. On March 16, 2011, the *Financial Times* reported that UBS, BAC, Citigroup, and Barclays received subpoenas from U.S. regulators "probing the setting of" USD-LIBOR "between 2006 and 2008." The *Times* further noted investigators had "demanded information from" WestLB, and that the previous fall, "all 16 members of the committee that helped the [BBA] set the dollar Libor rate during 2006-08 received informal requests for information." Brooke Masters, Patrick Jenkins & Justin Baer, "Banks served subpoenas in Libor case," FT.com, available at http://www.ft.com/cms/s/0/52958d66-501f-11e0-9ad1-00144feab49a.html#axzz1sJNEDIiI.

21. The same day, *MarketWatch* similarly reported "[m]ultiple U.S. and European banks, which provide borrowing costs to calculate Libor every day, have been contacted by investigators," including the DOJ, the SEC, and the CFTC. Carrick Mollenkamp and David Enrich, "Banks Probed in Libor Manipulation Case," *MarketWatch*, March 16, 2011.

22. The next day, *Bloomberg* reported that Barclays and Citigroup had received subpoenas from U.S. regulators and that WestLB, Lloyds, and BAC had been contacted by regulators. The article specified BAC had received subpoenas from the SEC and the DOJ. Gavin Finch and Jon Menon, "Barclays, Citigroup Said to Be Subpoenaed in Libor Probe," *Bloomberg*, March 17, 2011.

23. On March 23, 2011, *Bloomberg* revealed that Citigroup Inc., Deutsche Bank, BAC, and JPMorgan Chase were asked by U.S. regulators "to make employees available to testify as witnesses" in connection with the regulators' ongoing investigation. Joshua Gallu and Donal Griffin, "Libor Probe Spurs Witness Call-up at Citigroup, Deutsche Bank,"

*Bloomberg*, March 23, 2011.

24.     The next day, the *Financial Times* reported that Barclays was "emerging as a key focus of the US and UK regulatory probe into alleged rigging of [LIBOR]." According to the *Times*, investigators were "probing whether communications between the bank's traders and its treasury arm," which helps set LIBOR, "violated 'Chinese wall' rules that prevent information-sharing between different parts of the bank." The *Times* further stated investigators were "said to be looking at whether there was any improper influence on Barclays' submissions" during 2006-2008 for the BBA's daily survey used to set LIBOR. Brooke Masters and Megan Murphy, "Barclays at centre of Libor inquiry," FT.com, March 24, 2011, available at http://www.ft.com/intl/cms/s/0/1c3228f6-5646-11e0-82aa- 00144feab49a.html#axzz1sJNEDIiI.

25.     Additional information regarding the regulatory probes emerged during the next few months, including revelations about other banks' possible—or actual—misconduct.

26.     In an "Interim Management Statement" filed on April 27, 2011, for example, Barclays stated it was "cooperating with" the investigations by the UK Financial Services Authority, the CFTC, the SEC, and the DOJ "relating to certain past submissions made by Barclays to the [BBA], which sets LIBOR rates."

27.     RBS similarly disclosed, in a Form 6-K filed with the SEC on May 6, 2011, the bank was "co-operating with" the investigations being conducted by the CFTC, the SEC, and the European Commission "into the submission of various LIBOR rates by relevant panel banks."

28.     Soon after, on May 16, 2011, Lloyds disclosed that it too "had received requests for information as part of the Libor investigation and that it was co-operating with regulators, including the [CFTC] and the European Commission." Harry Wilson, "Lloyds Banking Group in Libor investigation," *The Daily Telegraph*, May 17, 2011. Britain's *Daily Telegraph* further reported that HBOS, which merged with Lloyds TSB in January 2009 to form Lloyds Banking Group, "was the main target given its near collapse in late 2008 as it lost access

to wholesale funding markets."

29.     On May 23, 2011, the *Telegraph* reported that the Federal Bureau of Investigation ("FBI") was working with regulators in connection with the LIBOR investigations, and the FBI's British counterpart, the Serious Fraud Office, "revealed it is also taking an active interest."

30.     In a Form 6-K filed with the SEC on July 26, 2011, UBS disclosed that it had "been granted conditional leniency or conditional immunity from authorities in certain jurisdictions, including the Antitrust Division of the DOJ, in connection with potential antitrust or competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR (Tokyo Interbank Offered Rate)." Accordingly, the company continued, it would "not be subject to prosecutions, fines or other sanctions for antitrust or competition law violations in connection with the matters [UBS] reported to those authorities, subject to [UBS's] continuing cooperation." The conditional leniency UBS received derives from the Antitrust Criminal Penalties Enhancement and Reform Act and the DOJ's Corporate Leniency Policy, under which the DOJ only grants leniency to corporations reporting *actual illegal activity*. UBS later disclosed (on February 7, 2012) that the Swiss Competition Commission had granted the bank conditional immunity regarding submissions for Yen LIBOR, TIBOR, and Swiss franc LIBOR.

31.     HSBC, in an interim report filed on August 1, 2011, disclosed that it and/or its subsidiaries had "received requests" from various regulators to provide information and were "cooperating with their enquiries."

32.     On or about the same day, Barclays—which several months earlier had referenced its "cooperation" with governmental entities investigating potential misconduct relating to LIBOR—specified the investigations involved "submissions made by Barclays" and other LIBOR panel members. Barclays further stated it was engaged in discussions with those authorities about potential resolution of these matters before proceedings are brought against the bank.

33.     On September 7, 2011, the *Financial Times* reported that as part of their LIBOR investigation, the DOJ and the CFTC—in assessing whether banks violated the Commodity Exchange Act, which can result in criminal liability—were examining "whether traders placed bets on future yen and dollar rates and colluded with bank treasury departments, who help set the Libor index, to move the rates in their direction," as well as "whether some banks lowballed their Libor submissions to make themselves appear stronger."   Brooke Masters and Kara Scannell, "Libor inquiry looks at criminal angle," FT.com, September 7, 2011, available at http://www.ft.com/cms/s/0/c8ed4248-d962-11e0-b52f-00144feabdc0.html#axzz1sRxAdyPS.

34.     On October 19, 2011, *The Wall Street Journal* reported that the European Commission "seized documents from several major banks" the previous day, "marking the escalation of a worldwide law-enforcement probe" regarding the Euro Interbank Offered Rate, or Euribor—a benchmark, set by more than 40 banks, used to determine interest rates on trillions of euros' worth of euro-denominated loans and debt instruments. The Euribor inquiry, the *Journal* explained, constitutes "an offshoot" of the broader LIBOR investigation that had been ongoing for more than a year. According to the *Journal*, while the list of financial firms raided by the European Commission was not available, people familiar with the situation had counted "a large French bank and a large German bank" among the targets, and the coordinated raids "occurred in London and other European cities."

35.     On December 9, 2011, *Law360* reported that the Japanese Securities and Exchange Surveillance Commission ("SESC") alleged that Citigroup Global Markets Japan Inc. and UBS Securities Japan Ltd. "employed staffers who attempted to influence" TIBOR "to gain advantage on derivative trades." The SESC recommended that the Japanese prime minister and the head of Japan's Financial Services Agency ("JFSA") take action against the companies. The Commission specified that Citigroup's head of G-10 rates and a Citigroup trader, as well as a UBS trader, were involved in the misconduct, further stating, "[t]he actions of Director A and

Trader B are acknowledged to be seriously unjust and malicious, and could undermine the fairness of the markets." Moreover, the Commission added, "[i]n spite of recognizing these actions, the president and CEO . . . who was also responsible for the G-10 rates, overlooked these actions and the company did not take appropriate measures, therefore, the company's internal control system is acknowledged to have a serious problem." Juan Carlos Rodriguez, "Japan Accuses Citi, UBS Of Market Trickery," *Law360*, December 9, 2011. *Law360* reported that the SESC released "a similar statement" about UBS's alleged conduct.

36. Citigroup and UBS did not deny the SESC's findings. A Citigroup spokesperson stated, "Citigroup Global Markets Japan takes the matter very seriously and sincerely apologizes to clients and all parties concerned for the issues that led to the recommendation. The company has started working diligently to address the issues raised." A UBS spokesperson similarly stated the bank was taking the findings "very seriously" and had been "working closely with" the SESC and the JFSA "to ensure all issues are fully addressed and resolved." She added, "We have taken appropriate personnel action against the employee involved in the conduct at issue."

37. Citigroup later disclosed that on December 16, 2011, the JFSA took administrative action against Citigroup Global Markets Japan, Inc. ("CGMJ") for, among other things, certain communications made by two CGMJ traders about the Euroyen Tokyo InterBank Offered Rate ("TIBOR"). The JFSA issued a business improvement order and suspended CGMJ's trading in derivatives related to Yen-LIBOR, as well as Euroyen and Yen-TIBOR from January 10 to January 23, 2012. On the same day, the JFSA also took administrative action against Citibank Japan Ltd. for conduct arising out of Citibank Japan's retail business and also noted that the communications made by the CGMJ traders to employees of Citibank Japan about Euroyen TIBOR had not been properly reported to Citibank Japan's management team.

38. UBS likewise recently revealed further details regarding the Japanese regulators' findings and the resulting disciplinary action. Specifically, the bank announced that

on December 16, 2011, the JFSA commenced an administrative action against UBS Securities Japan Ltd. ("UBS Securities Japan") based on findings by the SESC that: (i) a trader of UBS Securities Japan engaged in inappropriate conduct relating to Euroyen TIBOR and Yen LIBOR, including approaching UBS AG, Tokyo Branch, and other banks to ask them to submit TIBOR rates taking into account requests from the trader for the purpose of benefiting trading positions; and (ii) serious problems in the internal controls of UBS Securities Japan resulted in its failure to detect this conduct. Based on those findings, the JFSA "issued a Business Suspension Order requiring UBS Securities Japan to suspend trading in derivatives transactions related to Yen LIBOR and Euroyen TIBOR" from January 10 to January 16, 2012 (excluding transactions required to perform existing contracts). The JFSA also issued a "Business Improvement Order" requiring UBS Securities Japan to enhance "compliance with its legal and regulatory obligations" and to establish a "control framework" designed to prevent similar improper conduct.

39.     *The Wall Street Journal* has since cited people familiar with the UBS matter as identifying the trader as Thomas Hayes, who joined UBS Securities Japan in 2006 "and traded products linked to the pricing of short-term yen-denominated borrowings"; he worked at UBS for about three years.   Jean Eaglesham, Atsuko Fukase, & Sam Holmes, "Rate Probe Keys On Traders: Investigators Suspect Employees at Some Banks Tried to Manipulate Rates," *The Wall Street Journal*, February 7, 2012.

40.     In the same article, the *Journal* more broadly reported that investigators in the U.S. and foreign LIBOR probes "are focusing on a small number of traders suspected of trying to influence other bank employees to manipulate the rates."

41.     Other news accounts in recent months have confirmed—based at least in part on information from people familiar with the ongoing investigations—that investigators are examining potential improper collusion by traders and bankers to manipulate LIBOR or other rates. On February 3, 2012, for instance, Credit Suisse disclosed that the Swiss Competition

Commission commenced an investigation involving twelve banks and certain other financial intermediaries, including Credit Suisse, concerning alleged collusive behavior among traders to affect the bid ask spread for derivatives tied to the LIBOR and TIBOR reference rates fixed with respect to certain currencies, and collusive agreements to influence these rates.

42.     Additionally, on February 14, 2012, *Bloomberg* reported that two people with knowledge of the ongoing LIBOR probe said global regulators "have exposed flaws in banks' internal controls that may have allowed traders to manipulate interest rates around the world."   The same people, who were not identified by name (as they were not authorized to speak publicly about those matters), stated investigators also had "received e-mail evidence of potential collusion" between firms setting LIBOR. Those sources further noted Britain's Financial Services Authority was "probing whether banks' proprietary-trading desks exploited information they had about the direction of Libor to trade interest-rate derivatives, potentially defrauding their firms' counterparties." Lindsay Fortado and Joshua Gallu, "Libor Probe Said to Expose Collusion, Lack of Internal Controls," *Bloomberg*, February 14, 2012.

43.     *Bloomberg* further reported that RBS had "dismissed at least four employees in connection with the probes," and Citigroup and Deutsche Bank "also have dismissed, put on leave or suspended traders as part of the investigations."

44.     *Bloomberg* also reported that European Union antitrust regulators are also investigating whether banks effectively formed a global cartel and coordinated how to report borrowing costs between 2006 and 2008.

45.     In March 2012, the Monetary Authority of Singapore disclosed that it has been approached by regulators in other countries to help in investigations over the possible manipulation of interbank interest rates.   *Business Times*, March 9, 2012.

46.     Documents submitted in pending legal proceedings in Canada and Singapore strongly indicate some or all of defendants manipulated Yen-LIBOR, the Yen-based rate set by a 15-member BBA panel that, during the relevant period consisted of (and still

10

consists of) many of the same banks whose borrowing-cost quotes determine USD-LIBOR, including Barclays, Citibank, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, RBS, Bank of Tokyo, Rabobank and UBS.

47.     In the Canadian action, Brian Elliott, a Competition Law Officer in the Criminal Matters Branch of the Competition Bureau, submitted an affidavit in May 2011 (the "May 2011 Elliott Affidavit") in support of "an Ex Parte Application for Orders to Produce Records Pursuant to Section 11 of the Competition Act and for Sealing Orders" in the Court of Ontario, Superior Court of Justice, East Region. Specifically, the May 2011 Elliott Affidavit sought orders requiring HSBC Bank Canada, Royal Bank of Scotland N.V., Canada Branch, Deutsche Bank, J.P. Morgan Bank Canada, and Citibank Canada (referenced collectively in the Affidavit as the "Participant Banks") to produce documents in connection with an inquiry concerning whether those banks conspired to "enhance unreasonably the price of interest rate derivatives from 2007 to March 11, 2010; to prevent or lessen, unduly, competition in the purchase, sale or supply of interest derivatives from 2007 to March 11, 2010; to restrain or injure competition unduly from 2007 to March 11, 2010; and to fix, maintain, increase or control the price for the supply of interest rate derivatives from March 12, 2010 to June 25, 2010."

48.     The May 2011 Elliott Affidavit further states the Competition Bureau "became aware of this matter" after one of the banks (referenced in the affidavit as the "Cooperating Party") "approached the Bureau pursuant to the Immunity Program" and, in connection with that bank's application for immunity, its counsel "orally proffered information on the Alleged Offences" to officers of the Competition Bureau on numerous occasions in April and May 2011.  Furthermore, according to the Affidavit, counsel for the Cooperating Party "stated that they have conducted an internal investigation of the Cooperating Party that included interviews of employees of the Cooperating Party who had knowledge of or participated in the conduct in question, as well as a review of relevant internal documents." The Affidavit also notes that on May 17, 2011, counsel for the Cooperating Party provided the Competition Bureau

with "electronic records," which Elliot "believe[s] to be records of some of the communications involving the Cooperating Party that were read out as part of the orally proffered information by counsel for the Cooperating Party."

49.     The Affidavit recounted that, the Cooperating Party's counsel, during the relevant period the Participant Banks—at times "facilitated" by "Cash Brokers"—"entered into agreements to submit artificially high or artificially low London Inter-Bank Offered Rate ('LIBOR') submissions in order to impact the Yen LIBOR interest rates published by the [BBA]." Those entities engaged in that misconduct to "adjust[] the prices of financial instruments that use Yen LIBOR rates as a basis." The Affidavit further states the Cooperating Party's counsel "indicated the Participant Banks submitted rates consistent with the agreements and were able to move Yen LIBOR rates to the overall net benefit of the Participants."

50.     More specifically, counsel proffered that during the relevant period, the Participant Banks "communicated with each other and through the Cash Brokers to form agreements to fix the setting of Yen LIBOR," which "was done for the purpose of benefitting trading positions, held by the Participant Banks, on IRDs [interest rate derivatives]." By manipulating Yen LIBOR, the Affidavit continues, "the Participant Banks affected all IRDs that use Yen LIBOR as a basis for their price." The misconduct was carried out "through e-mails and Bloomberg instant messages between IRD traders at the Participant Banks and employees of Cash Brokers (who had influence in the setting of Yen LIBOR rates)." The Affidavit details: "IRD traders at the Participant Banks communicated with each  other their desire to see a higher or lower Yen LIBOR to aid their trading position(s). These requests for changes in Yen LIBOR were often initiated by one trader and subsequently acknowledged by the trader to whom the communication was sent. The information provided by counsel for the Cooperating Party showed that the traders at Participant Banks would indicate their intention to, or that they had already done so, communicate internally to their colleagues who were involved in submitting rates for Yen LIBOR. The traders would then communicate to each other confirming that the

agreed up rates were submitted. However, not all attempts to affect LIBOR submissions were successful. The Cash Brokers were asked by IRD traders at the Participant Banks to use their influence with Yen LIBOR submitters to affect what rates were submitted by other Yen LIBOR panel banks, including the Participant Banks."

51.     The Affidavit indicates the Cooperating Party's counsel further proffered that at least one of the Cooperating Party's IRD traders ("Trader A" or "Trader B") communicated with an IRD trader at HSBC, Deutsche Bank, RBS, JPMorgan (two traders), and Citibank. In that regard, the Affidavit specifies: "Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and instructions for the HSBC trader to get HSBC to make Yen LIBOR submissions consistent with his wishes. Attempts through the HSBC trader to influence Yen LIBOR were not always successful. Trader A also communicated his desire for a certain movement in the Yen LIBOR rate with the Cash Brokers. He instructed them to influence the Yen LIBOR submitters of HSBC. The Cash Brokers acknowledged making these attempts. Trader A communicated his trading positions, his desire for certain movement in Yen LIBOR and asked for the Deutsche IRD trader's assistance to get Deutsche to make Yen LIBOR submissions consistent with his wishes. The Deutsche IRD trader also shared his trading positions with Trader A. The Deutsche IRD trader acknowledged these requests. Trader A also aligned his trading positions with the Deutsche IRD trader to align their interests in respect of Yen LIBOR. The Deutsche IRD trader communicated with Trader A considerably during the period of time, mentioned previously, when Trader A told a Cash Broker of a plan involving the Cooperating Party, HSBC and Deutsche to change Yen LIBOR in a staggered and coordinated fashion by the Cooperating Party,  HSBC and Deutsche. Not all attempts to change the LIBOR rate were successful.  Trader A explained to RBS IRD trader who his collusive contacts were and how he had and was going to manipulate Yen LIBOR. Trader A also communicated his trading positions, his desire for certain movement in Yen LIBOR and gave instructions for the RBS IRD trader to get RBS to make Yen LIBOR submissions consistent with Trader A's wishes.

The RBS IRD trader acknowledged these communications and confirmed that he would follow through. Trader A and the RBS IRD trader also entered into transactions that aligned their trading interest in regards to Yen LIBOR. Trader A also communicated to another RBS IRD trader his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get RBS to make Yen LIBOR submissions consistent with his wishes. The second RBS IRD trader agreed to do this. Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and gave instructions for them [two JPM IRD traders] to get JPMorgan to make Yen LIBOR submissions consistent with his wishes. Trader A also asked if the IRD traders at JPMorgan required certain Yen LIBOR submissions to aid their trading positions. The JPMorgan IRD traders acknowledged these requests and said that they would act on them. On another occasion, one of the JPMorgan IRD traders asked Trader A for a certain Yen LIBOR submission, which Trader A agreed to help with. Trader A admitted to an IRD trader at RBS that he colluded with IRD traders at JPMorgan. Trader B of the Cooperating Party communicated with an IRD trader at Citi. They discussed their trading positions, advanced knowledge of Yen LIBOR submissions by their banks and others, and aligned their trading positions. They also acknowledged efforts to get their banks to submit the rates they wanted."

52.     On May 18, 2011, the Ontario Superior Court signed the orders directing the production of the records sought by the May 2011 Elliott Affidavit. On information and belief, the Affidavit was not publicly available until February 2012.

53.     Elliott submitted another affidavit in June 2011 (the "June 2011 Elliott Affidavit"), which sought an order requiring ICAP Capital Markets (Canada) Inc., believed to be one of the "Cash Brokers" referenced in the May 2011 Elliott Affidavit, to "produce records in the possession of its affiliates, ICAP PLC and ICAP New Zealand Ltd." The June 2011 Elliott Affidavit primarily detailed communications between "Trader A" (an IRD trader) of the previously-referenced "Cooperating Party" and an ICAP broker (referenced in the June 2011 Elliott Affidavit as "Broker X") during the relevant period.

14

54.     The Affidavit specifies that Trader A "discussed his current trading positions with Broker X and where he would like to see various maturities of Yen LIBOR move." Trader A "asked Broker X for Yen LIBOR submissions that were advantageous to Trader A's trading positions," and Broker X, in turn, "acknowledged these requests and advised Trader A about his efforts to make them happen." The Affidavit further states: "Counsel for the Cooperating Party has proffered that the expectation was for Broker X, directly or through other brokers at ICAP, to influence the Yen LIBOR submissions of Panel Banks.  Broker X communicated to Trader A his efforts to get brokers at ICAP in London to influence Yen LIBOR Panel Banks in line with Trader A's requests. The efforts of Broker X included contacting a broker at ICAP in London who issued daily LIBOR expectations to the market. Trader A also communicated to Broker X his dealings with traders at other Participant Banks and a broker at another Cash Broker. Not all efforts to influence Yen LIBOR panel banks were successful. Broker X had additional discussions around the setting of Yen LIBOR with another trader of the Cooperating Party ("Trader B")."

55.     On June 14, 2011, the Ontario Superior Court issued an order allowing the document requests concerning ICAP.

56.     The press has reported that UBS was the "Cooperating Party" referred to in the Elliott Affidavits.

57.     In addition to UBS's admissions in the Canadian proceedings, in a pending legal action in Singapore's High Court, Tan Chi Min, former head of delta trading for RBS's global banking and markets division in Singapore (who worked for RBS from August 12, 2006 to November 9, 2011), alleges in his Writ of Summons and Statement of Claim that the bank condoned collusion between its traders and LIBOR rate-setters to set LIBOR at levels to maximize profits. In the same filing, Min stated RBS commenced an internal probe following inquiries by European and U.S. authorities about potential LIBOR manipulation.

58.     Min—whom RBS terminated, asserting he engaged in "gross

misconduct"— alleges that RBS's internal investigations "were intended to create the impression that such conduct was the conduct not of the defendant itself but the conduct of specific employees who the defendant has sought to make scapegoats through summary dismissals." Min further alleges that it was "part of his responsibilities to provide input and submit requests to the rate setter and there is no regulation, policy, guideline or law that he has infringed in doing this," and that "it was common practice among [RBS]'s senior employees to make requests to [RBS]'s rate setters as to the appropriate LIBOR rate." Those requests, Min specified, "were made by, among others, Neil Danziger, Jezri Mohideen (a senior manager), Robert Brennan (a senior manager), Kevin Liddy (a senior manager) and Jeremy Martin," and the practice "was known to other members of [RBS]'s senior management including Scott Nygaard, Todd Morakis and Lee Knight." Min added that RBS employees "also took requests from clients (such as Brevan Howard) in relation to the fixing of LIBOR."

59.     Indeed, in responding to Min's allegations, RBS admitted he had tried to improperly influence RBS rate-setters from 2007 to 2011 to submit LIBOR rates at levels that would benefit him and that at least one other RBS employee had also engaged in similar conduct.

60.     In his complaint, however, Min alleged that he could not have influenced the rate on his own. He also stated it was "common practice" among RBS's senior employees to make requests as to the appropriate LIBOR rate.

## FACTS RELATING TO PLAINTIFFS

61.     Defendant JP Morgan Chase Bank, N.A. made a student loan to plaintiff Nathan Weglarz, on January 12, 2007.   Plaintiff Jerry Weglarz cosigned the loan.  A copy of the loan documents is attached as Appendix B.

62.     The rate on the loan was pegged to LIBOR as published on the first business day of the preceding calendar month.

63.     The loan was prepared on standard form documents.

64.     The LIBOR formula in plaintiffs' loan is standard for student loans.

65.     The standard form agreement provides for application of Rhode Island law to the extent the parties have the right to choose applicable law.

66.     Attorneys for National Collegiate Trust have demanded that plaintiffs pay the loan.

67.     Defendant National Collegiate Trust entered into or services thousands of student loans pegged to LIBOR.

68.     The LIBOR index purported, by its very nature, to be an objective index outside the control of the lender.

69.     Plaintiffs and any other person entering into a loan tied to LIBOR relied on the purported fact that LIBOR was an objective index outside the control of the lender.

70.     As a result of the manipulation described above, LIBOR was not in fact outside the control of defendant JP Morgan Chase Bank, N.A., or an objective index.

71.     Defendant JP Morgan Chase Bank, N.A. failed to disclose to plaintiffs and other borrowers that as a result of the manipulation described above, LIBOR was not outside the control of defendant JP Morgan Chase Bank, N.A.

72.     An agreement to charge an interest rate tied to an index that purports to be objective but is in fact subject to the lender's control is not a valid or conscionable agreement.  It amounts to an "agreement" to pay such rate of interest as the lender cares to impose from time to time, informing the borrower after the fact.

73.     If the manipulation resulted in raising of rates during a specific period, borrowers directly paid more than they should have.

74.     If the manipulation resulted in lowering of rates during a specific period, it made rates pegged to LIBOR appear to be more reasonable and affordable than they in fact were.

75.     The banks listed in paragraph 14 were motivated to manipulate and increase LIBOR on or about the first day of each month because they knew that many adjustable

rate mortgages and promissory notes contained a clause establishing that date as an index.

76.     Manipulating LIBOR so as to increase it (or keep it from decreasing as much as it should have) allowed such banks to raise the interest rates paid by plaintiffs on their adjustable rate notes.

77.     The manipulation was not reasonably capable of being discovered by a consumer until a date less than two years prior to filing of this action.

## CLASS ALLEGATIONS

78.     Pursuant to Fed. R.Civ.P. 23(a) and (b)(3), this action is brought on behalf of two classes.

79.     The Chase class consists of (a) all persons (b) who obtained or cosigned student loans (c) made or serviced or owned by JP Morgan Chase Bank, N.A.  (d) where the loan agreements provide for a rate of interest linked to LIBOR and (e) the loan is outstanding or was outstanding on or after January 1, 2007.

80.     The National Collegiate Trust class consists of (a) all persons (b) who obtained or cosigned student loans (c) made by any of the banks listed in paragraph 14, above, including but not limited to JP Morgan Chase Bank, N.A. (d) where the loan agreements provide for a rate of interest linked to LIBOR (e) National Collegiate Trust holds or held the loan and (f) the loan is outstanding or was outstanding on or after January 1, 2007.

81.     For purposes of Count II, the classes are limited to persons with addresses in Illinois, according to the loan documents.

82.     Each class is so  numerous that joinder of all members is impracticable. There are more than 50 members of each class.

83.     There are questions of law and fact common to the class members, which questions predominate over any questions affecting only individual class members.  The predominant common questions include:

        a.      Whether defendant JP Morgan Chase Bank, N.A. and the other

banks listed in paragraph 14 engaged in manipulation of LIBOR;

b.      Whether as a result the use of a rate indexed to LIBOR is unconscionable or invalid;

c.      Whether the manipulation of LIBOR, a supposedly objective rate, constitutes common law fraud;

d.      Whether the manipulation of LIBOR constitutes an unfair or deceptive act or practice;

e.      The appropriate relief.

84.      Plaintiffs' claims are typical of the claims of the class members. All are based on the same legal and factual issues.

85.      Plaintiffs will fairly and adequately represent the members of the class. Plaintiffs have retained counsel experienced in the prosecution of consumer credit claims and class actions.

86.      A class action is superior for the fair and efficient prosecution of this litigation. Many class members may be unaware that they have been victims of illegal conduct. Prosecution of individual actions is not economical.

## COUNT I – DECLARATORY AND EQUITABLE RELIEF REGARDING OBLIGATIONS UNDER CONTRACTS

87.      Plaintiffs incorporate paragraphs 1-86.

88.      The loan agreements signed by plaintiffs and the class members are unconscionable or invalid insofar as they are tied to LIBOR.

89.      Defendant JP Morgan Chase Bank, N.A. and anyone claiming under it, including National Collegiate Trust, should be estopped from attributing any value to LIBOR as used in its loan agreements.

WHEREFORE, plaintiffs request that the Court enter judgment in plaintiffs' favor and in favor of the class members for:

(1)      A declaration that the loan agreements signed by plaintiffs

and the class members are unconscionable or invalid insofar as they are tied to LIBOR.

(2)    A declaration that plaintiffs and the class members are entitled to have the value for LIBOR in the rate formulae in their loan agreements deemed to be zero, and the loans recalculated from their inception on that basis.

(3)    A judgment allowing any borrower who so desires to rescind their loans;

(4)    Appropriate compensatory damages;

(5)    Costs of suit;

(6)    Such other or further relief as is appropriate.

## COUNT II – CONSUMER FRAUD

90.    Plaintiffs incorporate paragraphs 1-86.

91.    Defendant JP Morgan Chase Bank, N.A. engaged in unfair and deceptive acts and practices, in violation of 815 ILCS 505/2, by (a) specifying a rate indexed to LIBOR at a time when it was manipulating such rate, and (b) representing that such rate was objective and outside the control of the lender.

92.    Defendant JP Morgan Chase Bank, N.A. engaged in such conduct in the course of trade and commerce.

93.    Plaintiffs and numerous other borrowers contracted for interest rates tied to LIBOR under the false impression that it was an objectively determined, impartial index of the cost of money.

94.    Defendant JP Morgan Chase Bank, N.A. intended to induce such reliance.

95.    Defendant National Collegiate Trust took the loans tainted by the fraud of JP Morgan Chase Bank, N.A.

96.    Plaintiffs and the class members were damaged as a result.

WHEREFORE, plaintiffs request that the Court enter judgment in plaintiffs' favor and in favor of the class members for:

    (1)    A declaration that the loan agreements signed by plaintiffs and the class members are unconscionable or invalid insofar as they are tied to LIBOR.

    (2)    A declaration that plaintiffs and the class members are entitled to have the value for LIBOR in the rate formulae in their loan agreements deemed to be zero, and the loans recalculated from their inception on that basis.

    (3)    A judgment allowing any borrower who so desires to rescind their loan;

    (4)    Appropriate compensatory and punitive damages;

    (5)    Attorney's fees, litigation expenses and costs of suit;

    (6)    Such other or further relief as is appropriate.

## COUNT III – COMMON LAW FRAUD

97.    Plaintiffs incorporate paragraphs 1-86.

98.    Defendant JP Morgan Chase Bank, N.A. committed common law fraud by (a) specifying a rate indexed to LIBOR at a time when it was manipulating such rate, and (b) representing that such rate was objective and outside the control of the lender.

99.    Plaintiffs and numerous other borrowers contracted for interest rates tied to LIBOR under the false impression that it was an objectively determined, impartial index of the cost of money.

100.    Defendant JP Morgan Chase Bank, N.A. intended to induce such reliance.

101.    Defendant National Collegiate Trust took the loans tainted by the fraud of JP Morgan Chase Bank, N.A.

102.    Plaintiffs and the class members were damaged as a result.

WHEREFORE, plaintiffs request that the Court enter judgment in plaintiffs' favor and in favor of the class for:

(1)     A declaration that the loan agreements signed by plaintiffs and the class members are unconscionable or invalid insofar as they are tied to LIBOR.

(2)     A declaration that plaintiffs and the class members are entitled to have the value for LIBOR in the rate formulae in their loan agreements deemed to be zero, and the loans recalculated from their inception on that basis.

(3)     A judgment allowing any borrowers who so desires to rescind their loans;

(4)     Appropriate compensatory  damages;

(5)     Punitive damages;

(6)     Costs of suit;

(7)     Such other or further relief as is appropriate.

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tiffany N. Hardy
EDELMAN, COMBS, LATTURNER
        & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## **JURY DEMAND**

Plaintiffs demand trial by jury.

s/Daniel A. Edelman
Daniel A. Edelman

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

T:\27732\Pleading\Complaint_Pleading.wpd